QUINN EMANUEL URQUHART & SULLIVAN LLP
Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Brett Arnold (Bar No. 266740)
brettarnold@quinnemanuel.com
Margaret Shyr (Bar No. 300253)
margaretshyr@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:      (650) 801-5000
Facsimile:      (650) 801-5100

Joseph Milowic III (*admitted pro hac vice*)
josephmilowic@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100

Attorneys for Juicero Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JUICERO INC., a Delaware corporation,<br><br>            Plaintiff,<br><br>      vs.<br><br>iTASTE CO., LTD., a/k/a iTaste Co., Ltd. Shanghai, China and Shanghai iTaste Electronics Technology Co., Ltd., d/b/a Juisir; FROOTHIE USA LLC, a Delaware limited liability company; and XIUXING "LEO" CHEN, an individual,<br><br>            Defendants. | CASE NO.  5:17-cv-01921-BLF<br><br>**JUICERO INC.'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Hearing:**<br><br>Date:      October 12, 2017<br>Time:      9:00 a.m.<br>Place:     Courtroom 3, 5th Floor<br>Judge:     Hon. Beth Labson Freeman |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

## **NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on October 12, 2017, at 9:00 a.m., or as soon thereafter as this matter may be heard, in Courtroom 3 of the above-entitled Court, located at 280 South 1st Street, San Jose, California, 95113, Plaintiff Juicero, Inc. ("Juicero") will, and hereby does, move under 35 U.S.C. § 283 and Federal Rule of Civil Procedure 65 for a preliminary injunction prohibiting Defendants iTaste Co., Ltd. (a/k/a iTaste Co., Ltd. Shanghai, China and Shanghai iTaste Electronics Technology Co., Ltd., d/b/a Juisir) ("iTaste"), Froothie USA LLC ("Froothie"), and Xiuxing "Leo" Chen ("Chen") (collectively "Defendants"), from making, using, offering to sell, or selling within the United States, or importing into the United States, the Juisir product or any product not more than colorably different.

This motion is based on this Notice of Motion and Motion, the accompanying memorandum of points and authorities, the concurrently filed declarations and exhibits of Mike Rosenthal, Paul Katz, and Joseph Milowic III, and all other papers and arguments submitted in connection with this matter and any matters of which the Court may take judicial notice.


DATED:  May 19, 2017                    QUINN EMANUEL URQUHART &
                                        SULLIVAN, LLP


                                        By  _/s/ Kevin P.B. Johnson_____
                                           Kevin P. B. Johnson
                                           Attorney for Juicero Inc.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................1

INTRODUCTION.................................................................................................................1

STATEMENT OF FACTS.....................................................................................................3

    A.    Juicero's Innovation And Industry Recognition ........................................3

    B.    The Infringing Juisir ........................................................................7

    C.    The Lawsuit ..................................................................................10

ARGUMENT .......................................................................................................................11

I.      PRELIMINARY INJUNCTION STANDARD .................................................11

II.     JUICERO IS LIKELY TO SUCCEED ON THE MERITS...............................11

    A.    Juicero Is Likely To Prove At Trial That The Juisir Infringes The '298 Patent ........................................................................................11

    B.    Juicero Is Likely To Prevail On Validity Of The '298 Patent................16

III.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM TO JUICERO .........................................................18

    A.    Juicero Is Likely To Suffer Irreparable Harm From The Juisir .............18

    B.    There Is A Causal Nexus Between The Harm And The Infringement ..................21

IV.    THE BALANCE OF EQUITIES FAVORS AN INJUNCTION.........................23

V.     THE PUBLIC INTEREST FAVORS AN INJUNCTION.................................24

VI.    CONCLUSION ...............................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### <u>CASES</u>

4

5
*Abbott Labs. v. Andrx Pharms., Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006) ..................................................................................... 11, 25

6
*Abbott Labs. v. Sandoz, Inc.*,
7
    544 F.3d 1341 (Fed. Cir. 2008) ............................................................................... 11, 18, 25

8
*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ............................................................................................ 11

9
*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
10
    299 F.3d 1336 (Fed. Cir. 2002) ............................................................................................ 12

11
*Apple Inc. v. Samsung Elecs. Co.*,
    678 F.3d 1314 (Fed. Cir. 2012) ............................................................................................ 19

12
*Apple Inc. v. Samsung Elecs. Co.*,
13
    735 F.3d 1352 (Fed. Cir. 2013) ............................................................................................ 21

14
*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015) ................................................................................. 21, 23, 24

15
*Apple Inc. v. Samsung Elecs. Co.*,
16
    839 F.3d 1034 (Fed. Cir. 2016) ............................................................................................ 16

17
*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
    726 F.3d 1296 (Fed. Cir. 2013) ............................................................................................ 19

18
*AstraZeneca LP v. Apotex Corp.*,
19
    633 F.3d 1042 (Fed. Cir. 2010) ............................................................................................ 18

20
*Bio–Technology Gen. Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996) .............................................................................................. 19

21
*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
22
    249 F.3d 1341 (Fed. Cir. 2001) ............................................................................................ 12

23
*Blackberry Ltd. v. Typo Prod. LLC*,
    No. 14-CV-00023-WHO, 2014 WL 1318689 (N.D. Cal. Mar. 28, 2014) .................... 11, 24

24
*Celsis In Vitro, Inc. v. CellzDirect, Ind.*,
25
    664 F.3d 922 (Fed. Cir. 2012) ....................................................................................11, 18, 25

26
*Crocs, Inc. v. ITC*,
    598 F.3d. 1294 (Fed. Cir. 2010) ........................................................................................... 16

27
*Cybor Corp. v. FAS Techs., Inc.*,
28
    138 F.3d 1448 (Fed. Cir. 1998) ............................................................................................ 12

*Douglas Dynamics, LLC v. Buyers Prod. Co.*,
   717 F.3d 1336 (Fed. Cir. 2013) ............................................................ 19, 22, 24, 25

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006) ......................................................................................... 16

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ............................................................................................. 16

*i4i Ltd. Partnership v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ......................................................................... 18

*Janssen Prod., L.P. v. Lupin Ltd.*,
   109 F. Supp. 3d 650 (D.N.J. 2014), *modified* 2016 WL 1029269 (D.N.J. Mar. 15,
   2016) .................................................................................................................. 21

*Kewanee Oil Co. v. Bicron Corp.*,
   416 U.S. 470 (1974) ......................................................................................... 25

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prod., LLC*,
   676 F. Supp. 2d 752 (E.D. Wis. 2009) ............................................................ 25

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) ........................................................................... 19

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) ....................................................................... 12

*Metalcraft of Mayville, Inc. v. The Toro Co.*,
   848 F.3d 1358 (Fed. Cir. 2017) ........................................................ 18, 20, 24, 25

*MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*,
   726 F. Supp. 2d 604 (W.D. Va. 2010) ............................................................ 23

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ........................................................................................... 16

*Polymer Techs. v. Bridwell*,
   103 F.3d 970 (Fed. Cir. 1996) ......................................................................... 18

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012) ....................................................................... 18

*QBAS Co. v. C Walters Intercoastal Corp.*,
   No. SACV 10-406 AG MLGX, 2010 WL 7785955 (C.D. Cal. Dec. 16, 2010) ......... 25

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ....................................................... 11, 18, 23, 24

*Roper Corp. v. Litton Sys., Inc.*,
   757 F.2d 1266 (Fed. Cir. 1985) ....................................................................... 16

*Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*,
   802 F. Supp. 1169 (D.N.J. 1992) ..................................................................... 24

*Trak, Inc. v. Benner Ski KG*,
    475 F. Supp. 1076 (D. Mass. 1979) ................................................................. 24

*TruePosition Inc. v. Andrew Corp.*,
    568 F.Supp.2d 500 (D. Del. 2008) ................................................................. 23

*Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*,
    No. 14-CV-2060, 2014 WL 6613116 (N.D. Ill. Nov. 21, 2014) ........................ 24

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) ................................................................. 12

*Windsurfing Int'l Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed. Cir. 1986) ................................................................. 24

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................. 11

## <u>STATUTES</u>

35 U.S.C. § 154 ................................................................. 11

35 U.S.C. § 271 ................................................................. 11

35 U.S.C. § 282 ................................................................. 16

35 U.S.C. § 283 ................................................................. 11

## **INTRODUCTION**

Defendants have imported, marketed, offered for sale, and sold a cold-press juicer that copies and infringes Juicero's innovative home juicer, the Juicero Press, the world's first countertop cold-press juice machine that requires no cleaning, as claimed in U.S. Patent No. 9,493,298.  To protect its intellectual property and prevent irreparable injury to its business and goodwill, Juicero respectfully moves for a preliminary injunction preventing Defendants from engaging in these unlawful activities.

The cold-press juicer is the heart of Juicero's business.  For the last four years, Juicero and its founders have invested considerable time and resources developing, marketing, and releasing a game-changing device that brings fresh, nutrient-rich juice into the consumer's kitchen at the push of a button, with no cleaning required.  Juicero has invested millions of dollars over the past several years in developing its cold-press juicer, and has caught the attention of the market with its groundbreaking and beautifully designed product:



Recognizing the Juicero Press's potential, defendants iTaste and Leo Chen created a cold-

press juicer of their own.  But rather than develop their own unique design or technological solution, they created a knock-off called the Juisir:



The Juisir copies both the innovative functionality and distinctive look of the Juicero Press. Not surprisingly, people quickly observed that the Juisir was a "knock off," "ripoff," and "clone" of the Juicero Press.  Nevertheless, defendants iTaste, Chen, and Froothie have teamed up to begin importing and selling the Juisir in the United States without authorization.

Nothing short of an injunction on the infringing Juisir will adequately protect Juicero's substantial investment and future prospects for its cold-press juicer, and the standard for a preliminary injunction is abundantly met here.  Juicero is likely to succeed in proving that the Juisir product infringes the '298 patent and the patent is likely to withstand any challenges to its validity.  Moreover, the straightforwardness of the patent claim and Defendants' obvious copying make the case for infringement clear without the need for discovery or claim construction. Defendants' actions also present an imminent threat of irreparable harm to Juicero.  The Juicero Press and accompanying Produce Packs are Juicero's only products.  As of now, Juicero is the only player in the market for an in-home cold-press juicer of this kind.  Indeed, Juicero created that niche.  Yet Defendants threaten to compete against Juicero in that market, using Juicero's own

1   patented technology and design to take market share away from it.  The balance of the equities and

2   the public interest also favor an injunction as the Juisir has only just begun to sell, and has not

3   been imported in bulk yet, so neither Defendants nor the consuming public will be harmed if

4   Defendants are made to focus on lawful activities instead of continuing to infringe Juicero's hard-

5   earned intellectual property.

6   **STATEMENT OF FACTS**

7   **A.     Juicero's Innovation And Industry Recognition**

8   Juicero was founded in 2013 by Doug Evans.  (Declaration of Mike Rosenthal ("Rosenthal

9   Dec.") ¶ 2.)  After his mother died of cancer and his father of heart disease, Doug set out on a

10  mission to understand healthy nutrition and devoted his life and career to enhancing access to

11  organic, plant-based nutrients.  (*Id.*)  The original technology and unique design of the Juicero

12  Press is the culmination of that work.  Doug collaborated with inventor Paul Katz and developed a

13  first design and prototype that they began testing in the summer of 2014.  After devoting several

14  years to the project, and developing twelve prototypes, Doug and Paul brought to market the

15  Juicero Press.  (Declaration of Paul Katz ("Katz Dec.") ¶ 2.)

16  From its modest beginnings in Doug's apartment, the Juicero Press business now operates

17  out of headquarters in San Francisco, with marketing, finance, product operations, hardware and

18  software design, and customer support functions there, as well as facilities in Los Angeles for food

19  manufacturing, processing, and packaging, research and development, logistics fulfillment, and

20  warehousing.  (Rosenthal Dec. ¶ 3.)  Juicero's 120 employees all work to support the Juicero Press

21  product, including preparing high quality, organic produce for the Produce Packs used in the

22  device.  (*Id.*)

23  The Juicero Press features a sleek, minimalist, and iconic design, and under the hood it

24  boasts an innovative cold-press that delivers thousands of pounds of force to extract high-nutrient

25  juice from fresh produce without generating unwanted heat or mess, with no cleanup of the juice

26  machine required, all on the kitchen counter.  (Katz Dec. ¶ 3.)

27

28



The innovative technology and stunning design of the Juicero were quickly recognized.  It was named a Gold Winner at the 2016 San Francisco Design Awards, where it was described as "the first accessible at-home cold-pressed juicing system" and "a compact, beautiful, and easy-to-use device that requires zero cleanup after use."  (Ex. 1.)[1]  It received the Editor's Choice Award at the 2016 Hotel Experience trade show, which praised it for creating "the first ever professional-quality, countertop cold-press juicer," able to "press[] plant-based organic Produce Packs that are delivered 100% fresh in minutes, at the touch of a button, eliminating all the typical prep and cleanup."  (Ex. 2.)  It earned an honorable mention in the Health category at the 2016 Innovation by Design Awards issued by Fast Company.  (Ex. 3.)  And received an Innovation Award in 2017 from the National Association of College and University Food Service.  (Rosenthal Dec. ¶ 4.)

Modern juicers look and work much differently than the Juicero Press.  Those juicers have large reservoirs for storing juice, elevated bowls for holding produce, jutting spigots, and lots of knobs, switches, buttons, handles, and parts that have to be removed and washed after each use (Ex. 4):

---

[1]  Citations to "Ex. __" refer to the exhibits attached to the Declaration of Joseph Milowic III submitted with this motion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Omega NC800**          **Breville 800 JEXL**

**Kuvings NS-950 Silent**          **Nutri-Stahl Juicer Machine**

Most juicers on the market are either centrifugal or masticating juicers.  (Katz Dec. ¶ 4.) Centrifugal juicers work by grating produce into small pieces and then rapidly spinning the juice out.  (*Id.*)  Masticating juicers use spinning augers to crush juice out of pulp.  (*Id.*)  Both methods involve contact between the machine's moving parts and the produce inside, creating a mess that has to be cleaned after each use, usually through disassembling the product.  (*Id.*)  The Juicero Press uses neither method.  Instead, the Juicero Press accepts pouches filled with fresh produce that are pressed with enormous force inside the machine to quickly extract nutrient-rich juice.  (*Id.* ¶ 5.)  There are no blades, grinders, spigots, or other machine parts that require disassembly or cleaning after each use.  (*Id.*)  In fact, due to the unique design of the Juicero Press, neither the produce or juice ever comes in contact with the device, eliminating the cumbersome and time-consuming clean-up step of other juicers.  (*Id.*)

1    The Juicero Press has been advertised and featured extensively throughout the United

2    States, including in The New York Times, Vogue, InStyle, Wired, goop, BusinessInsider,

3    TechCrunch, and mindbodygreen.  The vast majority of the advertisements and articles about the

4    Juicero Press focus on its innovative technology and distinctive design, noting for instance that

5    "[o]ther makers of high-end countertop juicers and blenders for home use, like Kuvings, Cuisinart

6    or Vita-Mix Corp., aren't offering these types of devices yet."  (Ex. 5 at 1.)  Goop.com called

7    Juicero "The Coolest Invention of 2016: Cold-Pressed Juice at Home With No Mess."  (Ex. 6 at

8    1.)  Vogue touted it as the "Completely Mess-Proof Juicer That Will Change Your Life."  (Ex. 7 at

9    1.)  Wired said it was "an attractive gadget" that was "a clever reinvention of an appliance that

10   hasn't changed much, despite the popularity of what it makes."  (Ex. 8 at 2, 3.)   And

11   mindbodygreen.com called it the "New Juicer That Makes The Best Green Juice We've Ever

12   Had."  (Ex. 9 at 1.)  As a result of this and other publicity, the Juicero Press has become uniquely

13   associated with Juicero in the minds of consumers.

14   Juicero has spent substantial resources on designing, developing, and marketing its cold-

15   press product.  From the time Doug Evans first began working in his apartment on the project up

16   to the present, Juicero has spent approximately ▮▮▮▮▮ on research and development (R&D)

17   personnel and expenses, approximately ▮▮▮▮ on equipment for R&D and manufacturing for

18   the Juicero Press and Produce Packs, and another ▮▮▮▮▮ in marketing expenses, including

19   advertising, social media, promotional videos, and other outreach activities, as well as marketing-

20   related salaries.  (Rosenthal Dec. ¶ 5.)  Since releasing the product in 2016, Juicero has sold more

21   than ▮▮▮▮, generating revenue of ▮▮▮▮▮ from sales of both the Juicero Press and the

22   accompanying Produce Packs, ▮▮▮▮▮▮▮▮  (*Id.*)

23   To protect its investment and developments, Juicero applied for utility patent protection for

24   its unique and innovative juicing methods and device.  On November 15, 2016, Doug Evans and

25   Paul Katz were issued U.S. Patent No. 9,493,298 titled "Juicing Systems and Methods" (the "'298

26   patent").  (Ex. 10.)  Juicero is the assignee of the '298 patent.  (*Id.*; *see also* Rosenthal Dec. ¶ 9.)

27   The Juicero Press is critically important to Juicero's business.  The Juicero Press and the

28   accompanying Produce Packs are the only products sold by Juicero.  (Rosenthal Dec. ¶ 6.)

1   Juicero's business, including the livelihood of its employees, is inextricably tied to the success of

2   its patented cold-press juicer.  (*Id.* ¶¶ 3, 6.)

3        The invention covered by the '298 patent, which dramatically cuts down the time and work

4   required to prepare fresh juice in the home or workplace, forms one of the most important reasons

5   that consumers purchase the Juicero Press, making that intellectual property one of the primary

6   drivers behind Juicero Press sales.  (Rosenthal Dec. ¶ 8.)  The success of the Juicero Press, and

7   enforcement of the '298 patent, are therefore at the core of Juicero's ability to compete fairly in

8   the market and benefit from the innovative solution Evans and Katz developed.  (*Id.* ¶¶ 6-9.)

9        **B.      The Infringing Juisir**

10       iTaste Co., Ltd. ("iTaste") is a Chinese company based in Shanghai, operating under the

11  name Juisir.[2]  (*See* Ex. 11 at 1 (trademark application).)  It was founded by Xiuxing "Leo" Chen

12  ("Chen"), the wealthy heir of a major Chinese pharmaceutical company.  (Ex. 12.)  Within the last

13  few months, iTaste has begun to sell its own cold-press juicer, called the Juisir.  (*E.g.*, *id.* at 3.)

14  Instead of developing its own solution for in-home juicing, however, iTaste chose to copy

15  Juicero's innovative product.  Just like the Juicero Press, the Juisir was created by iTaste and Chen

16  to accept pouches of produce that are pressed in the machine with the extracted juice dispensing

17  without contacting the device.  (*Id.*)  Numerous commenters have already recognized iTaste's

18  blatant copying:

19
20   - In response to a Forbes article about the Juisir and its debut at the 2017 CES
       trade show, one reader told the magazine that "[y]ou should at least mention
21     the Juicero in your story since this machine looks like an almost ***direct clone***
       of that product."  (Ex. 13 at 1 (emphasis added here and in the following
22     quotes).)

23   - An article by The Spoon called the Juisir the "***First Clone***" of the Juicero,
       noting that "[r]ecently at CES, ***a Juicero clone by the name of Juisir*** was on
24     display and, before long, the product showed up on Kickstarter.  (Interesting
       story about the man behind Juisir, Leo Chen, a Chinese pharmaceutical heir
25     who had a previous hit with his Nespresso clone for tea.)"  (Ex. 14 at 1-2.)

26   - Even a website advertising the Juisir noted its status as a fast-follower, saying

27  _____

28       [2]   On information and belief, iTaste is also known as iTaste Co., Ltd. Shanghai, China and
     Shanghai iTaste Electronics Technology Co., Ltd.

the "*JUISIR follows in the footsteps of the uber-convenient Juicero* in making juicing close to effortless." (Ex. 15 at 2.)

- Readers of Core77.com called the Juisir a "*ripoff*" of the Juicero Press, which they recognized as the "original." (Ex. 16 at 6.)

- And in a Reddit.com post about the Juisir, commenters called it a "*blatant rip off*" and said it "*looks and functions similar to Juicero*." (Ex. 17 at 7, 8.)

iTaste's original webpage for the Juisir even copied the design of Juicero's webpage, down to the tagline. (Ex. 18 (Juicero: "Make organic, cold-pressed juice at home every day, at the push of a button." iTaste: "Cold-pressed juice at home every day, at the push of a button.").)

iTaste has advertised the infringing Juisir product and made it available for pre-order through the Kickstarter (Ex. 19) and Indiegogo (Ex. 20) webpages, as well as promoting it through its own website, www.juisir.com (Ex. 21). Generally speaking, Kickstarter and Indiegogo are sites that allow companies like iTaste to sell pre-orders of their product to raise money for production. (*E.g.*, Ex. 19 at 4, 22-24.) Consumers who purchase the device in advance through these websites are the first to receive it when it ships. (*Id.*) Below is a screenshot from the Juisir page on Kickstarter, inviting consumers to "Pre-order NOW!":



According to the Kickstarter page, iTaste ran its pre-order funding campaign from January 16 to February 15, 2017 and raised $579,348 from 915 backers.  Over half the backers are from the United States, and both San Francisco and San Jose are listed in the top ten cities worldwide to have Kickstarter backers for the Juisir.  (Ex. 22 at 3.)  For between $399 and $499, the Juisir backers were able to order a Juisir machine along with juicing bags.  (Ex. 19 at 22; *see also id.* (offering a bulk order for $1,347).)  As one example, the following offer was accepted 197 times on the Kickstarter website (*see* Ex. 19 at 22):



iTaste's campaign on Indiegogo is similar, and appears to still be running, having raised an additional $507,449 for iTaste as of February 14, 2017 (Ex. 20 at 4):

As with Kickstarter, the Juisir page on Indiegogo can be accessed, and the Juisir ordered for shipment, "worldwide."  (*Id.* at 10.)  And the Indiegogo site similarly offers the Juisir machine along with juicing bags for between $499 and $525, with a bulk order at $1,497.  (*Id.* at 15.)

iTaste advertises that the Juisir will begin shipping to purchasers worldwide by as early May or June 2017.  (*E.g.*, Ex. 20 at 21.)  iTaste, however, has neither sought nor obtained

authorization from Juicero to incorporate Juicero's patented technology into the Juisir, or to make, use, sell, or offer to sell the infringing Juisir in the United States.  (Rosenthal Dec. ¶ 9.)  iTaste similarly does not have authorization from Juicero to import the infringing Juisir into the United States.  (*Id.*)

Nevertheless, iTaste has already imported the actual Juisir product, used it, and offered to sell it within the United States.  On both its Kickstarter and Indiegogo pages, iTaste boasts that it "brought JUISIR to attend CES 2017 in Las Vegas and successfully released JUISIR to the public."  (Ex. 19 at 24-25; Ex. 20 at 16-17.)  CES, the Consumer Electronics Show, is an annual trade show held in Las Vegas, Nevada that is attended by consumers from around the world.  It was reported that over 175,000 people from countries around the globe attended CES 2017 (Ex. 23 at 1), providing iTaste with an incredibly large audience in this country for its knock-off product.

iTaste has also partnered with defendant Froothie USA to import and sell the Juisir in the United States.  (*See, e.g.*, Dkt. 28, ¶¶ 2, 19.)  Froothie's website, www.froothie.com, advertises the Juisir as the "[i]nnovative cold press juicer that never needs any cleaning.  Ever."  (Ex. 24 at 2.)  Froothie currently offers the Juisir for $495 and says that units are "selling out fast."  (*Id.* at 2, 4.)



Like the other defendants, Froothie has no permission to make, use, sell, offer to sell, or import the Juisir, anywhere.  (Rosenthal Dec. ¶ 9.)

C.    The Lawsuit

Juicero filed this lawsuit on April 6, 2017, shortly after learning of Defendants' actions.  (Dkt. 1.)  Juicero alleged utility patent, trademark, and trade dress infringement, as well as unfair competition.  (*Id.*)  Juicero filed an amended complaint on April 14, 2017, adding additional

1  aliases for defendant iTaste.  (Dkt. 19.)  For the sake of simplicity and expedience at this stage,

2  Juicero is moving for an injunction only as to the utility patent claim.

3  <center>**ARGUMENT**</center>

4  **I.    PRELIMINARY INJUNCTION STANDARD**

5      In cases of patent infringement, a court "may grant injunctions in accordance with the

6  principles of equity to prevent the violation of any right secured by patent, on such terms as the

7  court deems reasonable."  35 U.S.C. § 283.  Indeed, "[t]he essential attribute of a patent grant is

8  that it provides a right to exclude competitors from infringing the patent."  *Acumed LLC v. Stryker*

9  *Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (citing 35 U.S.C. § 154(a)(1)).   Without the

10  protection of an injunction, an infringer "may cause a patentee irreparable harm not remediable by

11  a reasonable royalty," *id.*, including harm "that no damages payment, however great, could

12  address," *Celsis In Vitro, Inc. v. CellzDirect, Ind.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

13  Accordingly, courts routinely issue preliminary injunctions in patent cases.  *E.g.*, *Abbott Labs. v.*

14  *Sandoz, Inc.*, 544 F.3d 1341, 1343 (Fed. Cir. 2008); *Blackberry Ltd. v. Typo Prod. LLC*, No. 14-

15  cv-00023-WHO, 2014 WL 1318689 (N.D. Cal. Mar. 28, 2014);  *Robert Bosch LLC v. Pylon Mfg.*

16  *Corp.*, 659 F.3d 1142, 1153 (Fed. Cir. 2011).

17      A preliminary injunction is proper where (1) the plaintiff is likely to succeed on the merits;

18  (2) it is "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of

19  equities tips in [its] favor;" and (4) an injunction is in the public interest.  *Winter v. Natural Res.*

20  *Def. Council, Inc.*, 555 U.S. 7, 25 (2008); *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331,

21  1334 (Fed. Cir. 2006).

22  **II.    JUICERO IS LIKELY TO SUCCEED ON THE MERITS**

23      **A.    Juicero Is Likely To Prove At Trial That The Juisir Infringes The '298 Patent**

24          1.    Utility Patent Infringement Standard

25      It is infringement to make, use, sell, offer to sell or import a product covered by the claims

26  of a patent without the authority of the patentee.  35 U.S.C. § 271(a).  Courts use a two-step

27  analysis for infringement claims:  "First, the court determines the scope and meaning of the patent

28  claims asserted ... and then the properly construed claims are compared to the allegedly infringing

device."  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citations omitted).  Literal infringement of a claim exists when every claim limitation "reads on"—or is found in—the accused device or method.  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002).[3]

### 2.   The '298 Patent And The Juicero Press

Juicero's '298 patent (Ex. 10) is titled "Juicing Systems and Methods" and covers, among other things, a device for extracting juice from food matter through juicer cartridges.  While claim construction is a common practice in patent cases, not every claim limitation—or even every claim—requires construction.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is not an "obligatory exercise in redundancy").  Claim construction is appropriate to "clarify and when necessary to explain what the patentee covered by the claims."  *Id.*  Here, no formal claim construction is necessary because the asserted claim of the '298 patent, Claim 3, uses simple, clear terms that should all be accorded their plain and ordinary meaning.  *See, e.g.*, *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) ("the meaning of 'melting' does not appear to have required 'construction,' or to depart from its ordinary meaning"); *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (holding that district court properly instructed jury to use ordinary meanings of "irrigating" and "frictional heat").

Claim 3 of the '298 patent covers the following:

3.   A juicer comprising:

a region configured to receive one or more compressible juicer cartridges including an outlet and food matter contained therein;

a pressing element configured to apply pressure to the one or more juice cartridges, wherein the region and the pressing element are configured and arranged to dispense fluid extracted from the one or more juicer cartridges without the extracted fluid or the food matter directly contacting the region or pressing element; and

a dispensing point associated with the region, wherein the dispensing point is configured and arranged to receive the outlet of each juicer cartridge of the one or more juicer cartridges, wherein the region and pressing element are

---

[3]   Juicero is not raising the issue of infringement under the doctrine of equivalents in this motion but reserves the right to do so in this litigation.

constructed so that the outlet of each juicer cartridge of the one or more juicer cartridges extends beyond the region and pressing element.  (Ex. 10 at 35.)

The asserted claim uses non-technical terms whose meanings to one of skill in the art are readily apparent even to a lay person, especially in context.  As a result, no construction of the claim terms is needed to supplement their plain meaning.

The Juicero Press embodies Claim 3 of the patent.  It includes:  (1) a region that receives juicer cartridges, with the cartridges having both an outlet and food matter inside; (2) a pressing element that applies pressure to the juicer cartridge to extract fluid from it without the fluid or food matter touching the machine; and (3) a dispensing point below the pressing region that allows the cartridge to extend beyond the pressing region and dispense the fluid.  (Katz Dec. ¶ 6.)  In fact, those precise elements are at the heart of Juicero's advertising, which highlights how the Juicero system works with produce-filled packs to quickly provide nutrient-dense juice production with "zero cleanup" (Ex. 25 at 3):



3.   The Juisir Infringes Claim 3 Of The '298 Patent

Juicero will likely prove that the accused Juisir contains every element of Claim 3.  *First*,

according to Defendants' own marketing materials and Froothie's counterclaims, the accused Juisir is a cold-press juicer with a region that receives compressible "juice packs" or "J-Packs." The cartridges or "packs" include an outlet—the elephant's nose—and can contain food matter within.  (*See, e.g.*, Dkt. 28, ¶ 15.)   The following diagram is included in Defendants' various webpages for the Juisir in a section called "How Does It Work?" (Ex. 19 at 6; Ex. 20 at 6), which was reproduced and described in Froothie's own pleadings (Dkt. 28, ¶ 17):

| **1** | **2** | **3** |
|---|---|---|
| Put fruits or vegetables into the bag or buy J-Pack | Place the bag into JUISIR. | Push the button and 90 seconds later Enjoy a glass of freshly pressed juice. |

*Second*, the Juisir has a pressing element that applies pressure to the juice cartridge such that the extracted fluid is dispensed without the juice or food matter ever contacting the machine. Defendants tout that their pressing element "exerts about 8 tonnes of force so that the fruit is squashed to a paper-like thinness and virtually every drop of nutritious juice is captured in the glass."  (Ex. 19 at 8; Ex. 20 at 8; *see also* Dkt. 28, ¶¶ 17, 41 (Froothie claiming that "[t]he JUISÍR is capable of pressing customers' fresh fruits and vegetables with over 8 tons of pressure," and that "[w]ithin 90 seconds, the cold-press process is complete and the juice flows into the user's glass, ready to enjoy").)   Defendants also boast that the process is mess free because neither the

extracted juice nor the food matter in the pouch ever come into contact with the machine: "JUISIR works with our uniquely designed juicing bags which completely separate fruit and vegetables from the machine, meaning JUISIR itself never needs to be cleaned." (Ex. 19 at 12; Ex. 20 at 10; Dkt. 28, ¶ 17 (Froothie describing the juicing bag system and claiming "[t]here is no need for the user to clean the JUISÍR machine").)   In various animations and videos on their webpages, Defendants demonstrate the process. (*E.g.*, Ex. 26.)   In the animation below, for example, Defendants illustrate on their Kickstarter page how the Juisir's pressing element acts on the juice cartridge to squeeze juice out of the pouch in 90 seconds:



*Third*, the Juisir has a dispensing point that allows the outlet of the juicer cartridge to extend out of the pressing region.  Without this feature, the juice would be trapped in the cartridge or it would be forced out of the cartridge into the pressing region of the device, not the glass, causing juice to come into contact with the machine. (Katz Dec. ¶ 6.)  By including a dispensing point for the cartridge, the extracted juice instead flows directly into the glass below (Ex. 19 at 11; Ex. 20 at 5-6, 9; *see also* Dkt. 28, ¶ 15 ("JUISÍR bags resemble an elephant's appearance, with the elephant's trunk directing the flow of the juice."); *id.* ¶ 17 (claiming that after "the cold-press process is complete," "the juice flows into the user's glass, ready to enjoy")):



1    Defendants' own advertising and pleadings make the infringement case against them.

2    Every element of Claim 3 is met.  Juicero will undoubtedly be able to prove this at trial.

3    **B.    Juicero Is Likely To Prevail On Validity Of The '298 Patent**

4    Having been issued by the federal government, the '298 patent is presumed valid.  35

5    U.S.C. § 282(a).  Consequently, Defendants have the "burden of establishing invalidity," *id.*, and

6    must do so through clear and convincing evidence, *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91,

7    95 (2011).  Further, any evidence presented in the preliminary injunction context has to be

8    considered in light of this burden and heightened standard of proof.  *See Gonzales v. O Centro*

9    *Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he burdens at the

10   preliminary injunction stage track the burdens at trial."); *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d

11   1266, 1270 (Fed. Cir. 1985) (burden of establishing invalidity remains on the challenger at

12   preliminary injunction phase).

13   Juicero is unaware of any prior art that raises a substantial question about the validity of

14   the asserted '298 patent claim.  The '298 patent was issued over considerable prior art:  a total of

15   154 references from around the world are cited on the face of the patent, including 113 from the

16   United States and 41 from foreign countries.  Allowance of the '298 patent over such a large

17   volume of cited prior art bolsters its validity.

18   Secondary considerations also show that the '298 patent was not an obvious invention.  *See*

19   *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966) ("Secondary considerations

20   … might be utilized to give light to the circumstances surrounding the origin of the subject matter

21   sought to be patented" and serve as "indicia of … nonobviousness"); *Crocs, Inc. v. ITC*, 598 F.3d

22   1294, 1310 (Fed. Cir. 2010) ("Secondary considerations can be the most probative evidence of

23   non-obviousness in the record, and enables the … court to avert the trap of hindsight.") (quotation

24   marks omitted).  Among the secondary considerations are "commercial success enjoyed by

25   devices practicing the patented invention, industry praise for the patented invention, copying by

26   others, and the existence of a long-felt but unsatisfied need for the invention."  *Apple Inc. v.*

27   *Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc).  The evidence here

28   establishes them all.

The Juicero Press has enjoyed commercial success since its release, selling over ███ ███ in the last year, with ████████████ (Rosenthal Dec. ¶ 5.)  And the connection between Juicero's patented invention and the Juicero Press's sales could not be clearer:  there is excitement around the Juicero Press's patented cold-press juicing system because it requires no clean-up as claimed (*i.e.*, "without the extracted fluid or the food matter directly contacting the region or pressing element" (Ex. 10 at 35)):

- The Juicero Press was named a Gold Winner at the 2016 San Francisco Design Awards, where it was described as "the first accessible at-home cold-pressed juicing system" "***that requires zero cleanup after use.***"  (Ex. 1 at 3 (emphasis added here and in the following quotes).)

- The Juicero Press received the Editor's Choice Award at the 2016 Hotel Experience trade show, which praised it for creating "the first ever professional-quality, countertop cold-press juicer," able to "press[] plant-based organic Produce Packs that are delivered 100% fresh in minutes, at the touch of a button, ***eliminating all the typical prep and cleanup.***"  (Ex. 2 at 1.)

- Goop.com called Juicero "The Coolest Invention of 2016: Cold-Pressed Juice at Home ***With No Mess***."  (Ex. 6 at 1.)  And Vogue touted it as the "Completely ***Mess-Proof Juicer*** That Will Change Your Life."  (Ex. 7 at 1.)

Likewise, the Defendants have had rapid success selling their infringing Juisir.  iTaste quickly raised over $1.1 million in funding through pre-orders on Kickstarter and Indiegogo, far exceeding its goals.  (Ex. 19 at 3 ($579,348 through Kickstarter); Ex. 20 at 4 ($590,654 through Indiegogo).)  And Froothie boasts that the Juisir is "selling out fast."  (Ex. 24 at 2.)  And like the Juicero Press, the Juisir has received praise for its use of the patented invention, albeit undeservedly.  *See infra* p. 22.

The patented invention was also undoubtedly copied from Juicero by Defendants.  Juicero began testing Juicero Press prototypes with consumers in the fall of 2015.  (Katz Dec. ¶ 2.)  And the product officially launched and started shipping to consumers in Spring 2016.  (Rosenthal Dec. ¶ 5.)  This corresponds with the '298 patent, which was filed on September 10, 2015 and first published on January 7, 2016.  (Ex. 10 at 1.)  In direct line with these events, iTaste and Chen admittedly did not begin designing the Juisir until the same time the Juicero Press became public.  (Ex. 20 at 18 (timeline of Juisir development).)  And the Juisir design was "improve[d]" and

"refined" after the Juicero Press was shipped to customers.  (*Id.*)  Not surprisingly, as seen in the quotes above, various consumers have already recognized that the Juisir is a "rip-off" and "clone" of the Juicero Press.  *See supra* pp. 7-8.

The '298 patent has also satisfied a long-felt but unmet need—namely, a countertop juicer that can create nutritious, appealing juice without the drawbacks of creating heat (which can reduce the quality and nutritional value of the juice) or a mess (requiring time spent disassembling and cleaning the machine).  For all of these reasons, the '298 patent is not invalid.

## III.  A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM TO JUICERO

### A.  Juicero Is Likely To Suffer Irreparable Harm From The Juisir

An injunction is warranted because Juicero is "likely to suffer irreparable harm if the preliminary injunction is not granted and there is a causal nexus between the alleged infringement and the alleged harm."  *Metalcraft of Mayville, Inc. v. The Toro Co.*, 848 F.3d 1358, 1368 (Fed. Cir. 2017).  It is well settled that loss of market share or customers as a result of infringing conduct supports a finding of irreparable harm.  *Robert Bosch*, 659 F.3d at 1153-54; *Polymer Techs. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996).  And courts are most likely to grant an injunction where the parties are direct competitors in the same market, as the potential harm in allowing the defendant to continue its infringing conduct is often greatest in that context.  *See, e.g.*, *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm"); *Celsis*, 664 F.3d at 932 (affirming district court's finding that "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer"); *see also Robert Bosch*, 659 F.3d at 1153; *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010).  A wide range of other harms, such as "loss of revenue, goodwill, and research and development support [also] constitute irreparable harm." *Sandoz*, 544 F.3d at 1361-62 (citing *Bio–Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996)); *see also AstraZeneca LP v. Apotex Corp.*, 633 F.3d

1042, 1063 (Fed. Cir. 2010) (loss of goodwill as a result of infringing conduct supports a finding of irreparable harm); *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013) ("[P]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

The parties undoubtedly compete in the same market, advertising to consumers who want a no-mess cold-press juicer for their countertop. As various sources have already recognized, this is a unique niche that Juicero actually worked to create. *See supra* p. 6. The parties are therefore not simply competing in the same general market amongst many other products, but head to head in the commercial space that Juicero created. Defendant Froothie has even been intentionally using the Juicero name to drum up business for the infringing Juisir. This first began with Froothie running paid ads online for the Juisir when internet users were instead searching for the word "Juicero" on search engines like Google. (Ex. 27.) After Juicero sent a cease and desist letter to Froothie (Milowic Dec. ¶ 28), Froothie refused to stop bidding on the Juicero name and instead began running ads that said "Don't buy the JUICERO" (Ex. 28). Defendants are undeniably vying for Juicero's customers. The threat of irreparable harm from loss of market share is therefore especially acute here. *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("[M]ere damages will not compensate for a competitor's increasing share of the market, a market which Douglas competes in, and a market that Douglas has in part created with its investment in patented technology."); *Apple Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1328 (Fed. Cir. 2012) (sustaining finding of irreparable harm where relevant "market appeared to be dominated by only two manufacturers" as "[plaintiff's] market share decreased in accordance with the increase in [defendant's] market share").

Defendants may try to diffuse the irreparable harm they pose by pointing to a recent press article by Bloomberg that commented negatively on the Juicero Press. The article noted that one particular type of Produce Pack could be squeezed by hand as well as in the Juicero Press. That article was then repeated by other media sources that did not conduct their own independent review of the machine. In reality, the Juicero Press can extract quantities of juice from a variety of food types that could not be done by hand. Most important here, however, is Defendants'

response to the one-sided media article: they have tried to use it to further increase their own sales at Juicero's expense by leveraging Juicero's own patented system.  Just after the articles came out, Chen and iTaste updated their Kickstarter page to say that "We were also surprised that a company with 120 million in funding has been making juice pack that can literally be squeezed with your bare hands."  (Ex. 35 at 3.)  Defendants then try to distinguish their machine, not based on the method, which is the same as Juicero's, but on the consumer's ability to put their own produce into the Juisir juice packs.  (*Id.*)  A comment posted by a consumer that same day on the Kickstarter page confirmed that Defendants' strategy of taking sales from Juicero was working.  "[C]learing the air with the recent update against juicero eased my mind. … Can't wait to get this [Juisir]."  (Ex. 36 at 3.)  Chen is even quoted in a follow-on piece by Forbes saying, "Who even know[s] what's inside the [Juicero] bag?" and that he "suspects Juicero's bags are already mostly juice to begin with" (Ex. 37 at 4)—a false assertion as Juicero's Produce Packs contain freshly chopped produce, not juice.  And so, by offering consumers Juicero's own patented technology, which they have no right to do, and by wrongly denigrating Juicero's products, Defendants unfairly compete against Juicero at a critical time, in a way that other juicer makers cannot.

Further, because the patented technology centers around juicer cartridges that are compatible with the machine, Juicero stands to lose not only sales of juicers, but also the Produce Packs that a Juisir consumer might otherwise have wanted to purchase from Juicero absent the infringement.  (Rosenthal Dec. ¶ 6.)  That *too* is a source of irreparable harm, as Juicero will lose not only sales of its juicer due to the infringement, but also downstream income from future purchases of its Produce Packs for years to come.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 646 (Fed. Cir. 2015) (defendant "places a substantial hardship" on a plaintiff by "causing lost market share and lost downstream sales and by forcing [plaintiff] to compete against its own patented invention"); *Metalcraft of Mayville*, 848 F.3d at 1368 (district court correctly ruled that "damage… is irreparable because it is impossible to quantify the damages caused by the loss of a potentially lifelong customer") (internal quotation marks omitted); *MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 638-39 (W.D. Va. 2010) (loss of future customers can establish irreparable harm).  Indeed, Defendants plan to sell not only empty, do-it-

yourself packs, but also prepared "J-packs" sourced by "local fruit and vegetable suppliers" (Ex. 29 at 2), another market that Juicero created and currently sells in (*see, e.g.*, Ex. 30; Ex. 31).

A loss of revenue from its proprietary technology will also threaten harm to the value of the research, development, and marketing Juicero invested in the Juicero Press, which would cause a diminished ability to continue its R&D efforts. ███████████████████████ ███████████████████████ (Rosenthal Dec. ¶ 7.)  But the Juicero Press is currently the only source of revenue for the company by which it would fund its own R&D.  (*Id.* ¶ 6.)  Courts routinely find that this also constitutes irreparable harm.  *See, e.g.*, *Janssen Prod., L.P. v. Lupin Ltd.*, 109 F. Supp. 3d 650, 697 (D.N.J. 2014), *modified* 2016 WL 1029269 (D.N.J. Mar. 15, 2016) ("a diminished ability to invest in research and development" demonstrates irreparable harm).

### B.       There Is A Causal Nexus Between The Harm And The Infringement

To establish a "causal nexus" between the irreparable harm and the alleged infringement, Juicero need only show "'some connection' between the patented feature[] and demand for the infringing product[]."  *Apple Inc. v. Samsung Electronics Co*., 735 F.3d 1352, 1364 (Fed. Cir. 2013).  There are "a variety of ways" for Juicero to do this, "for example, with evidence that a patented feature is one of several features that cause consumers to make their purchasing decisions," "that the inclusion of a patented feature makes a product significantly more desirable," or, conversely, "that the absence of a patented feature would make a product significantly less desirable."  *Id*.  Juicero need not show that the patented feature is "the exclusive or predominant reason why consumers bought [the infringing] product[]," only that "the patented features impact consumers' decisions to purchase the accused devices."  *Apple*, 809 F.3d at 642.

Here, there can be no doubt there is "some connection" between Juicero's patented method, which was wrongfully incorporated into the Juisir, and consumer demand for that infringing product.  Defendants' primary marketing message on Kickstarter and Indiegogo calls out the benefits created by their misuse of Juicero's proprietary invention, namely high quality juice at high yields with no cleaning.  (*E.g.*, Ex. 19 at 7-19; Ex. 20 at 11.)  Advertising on the Juisir and Froothie websites calls out advantages of the patented method as well, telling consumers that of the "12 reasons for choosing Juisir," the top 3 are "Juicing Without The Cleaning," "More

1   Juice," and "More Nutrients."  (Ex. 21 at 2-3; Ex. 24 at 8.)

2       Defendants even demonstrate how they incorporated the patented method into their device

3   to produce these benefits.  *See supra* pp. 13-16.  And Juisir purchasers have already confirmed that

4   this is why they are buying the infringing product:  "What a great project- no washing up of the

5   machine!  I just backed one as a gift, still considering w[h]ether to get a second one for myself."

6   (Ex. 32 at 34 (comment by "Monika").)  "While the 'no cleaning' will get most of the marketing

7   attention, I believe the quality of juice produced and yield is of greater benefit to the healthy

8   enthusiast; the no cleaning part makes this thing THAT much more attractive!  I cannot wait to get

9   this machine."  (*Id.* at 29 (comment by "Ken Allen EA Mst").)  "I'm sorry if I keep asking about

10  cleaning but it's important to me since that's the whole point of this juicer."  (*Id.* at 25 (comment

11  by "Jerry").)

12      The media has also highlighted the connection between the misappropriated technology

13  and demand for the Juisir.  Forbes, for example, praised the infringing Juisir as "an affordable

14  juicer that promises to produce high quality cold-press fruit juices ***without requiring post-juice***

15  ***cleaning.***"  (Ex. 12 at 3 (emphasis added).)  WonderfulEngineering.com said much the same and

16  mistakenly attributed the innovation to the Defendants:  "You don't have to fret over the time-

17  consuming process of squeezing those fruits anymore as the founders at Juiser have come up with

18  a solution to this issue.  Juiser is a revolutionary way of extracting that fruit juice out in no time …

19  [and] ensures that the machine and the ingredients are never in contact."  (Ex. 33 at 2.)  A popular

20  juice blog—NaturalJuiceJunkie.com—similarly praised Juisir as "[t]he juicer that requires ZERO

21  cleaning," saying that "[j]ust as the iPhone changed the way we think of mobile phones, I think

22  JUISIR could be about to revolutionise juicing."  (Ex. 34 at 2, 3.)  And Defendants' have even

23  posted a collage on their websites with even more media praise for their device's ability to achieve

24  the results only made possible by infringing Juicero's patent.  (Ex. 19 at 5; Ex. 20 at 6.)

25      Not only does this praise show a strong causal link between Juicero's misappropriated

26  invention and consumer demand for the infringing Juisir, it also shows that Juicero's reputation as

27  an innovator in the juicing industry is being harmed by Defendants' wrongly getting attention for

28  Juicero's innovations.  This further weighs in favor of an injunction.  *See Douglas Dynamics*, 717

F.3d at 1344-45 (finding patentee's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products].").  And not only is the media already mistakenly attributing Juicero's innovations to the Defendants, consumers are doing the same, as seen in these comments on the Juisir Kickstarter page:

- "Congratulations on a wonderful product and a very well run campaign!  ***You are being very innovative and all your hard work shows***.  I believe you will be very successful and I wish you the very best." (Ex. 32 at 12 (comment by "Jerry") (emphasis added here and in the following quotes).)

- "Congratulations and a well promoted campaign; ***through your vision, hard work and the backing from juicy communities you've done it!!*** I'm proud to be a small part of this – thanks"  (*Id.* (comment by "Maggie Sampson").)

- "***This juicer is truly revolutionary. Fantastic idea***. I hope it lives up to all I've seen and read about it. Good luck!! By the way, I was referred by Discountjuicers..." (*Id.* at 30 (comment by "Cliff King").)

- "***Great idea.*** I use slow juicers and clean up takes 10 minutes"  (*Id.* at 28 (comment by "Phil Thomas").)

The patented invention is not only at the heart of the infringing Juisir, it is at the heart of *Juicero's* product, and irreparable harm to a plaintiff is particularly likely where the "patented technology is at the core of [plaintiff's] business."  *TruePosition Inc. v. Andrew Corp.*, 568 F.Supp.2d 500, 531 (D. Del. 2008), *cited with approval in Robert Bosch*, 659 F.3d at 1152.  Here, not only is the Juicero Press covered by the asserted invention, it is also the sole device currently being sold by Juicero.  *See supra* pp. 6-7.

## IV.   THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

The balance of equities also weighs heavily in favor of an injunction.  The substantial and irreparable harm Juicero will suffer without injunctive relief far outweighs any potential, legitimate harm Defendants may allege.  Defendants elected to build their business on a product that mimics Juicero's innovative cold press device.  That Defendants might have to expend resources to come up with their own solution does not weigh against an injunction, it is a problem of Defendants' own making:  "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected."  *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1002 n.12 (Fed. Cir.

1986); *accord Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1179 (D.N.J. 1992) ("Such a hardship is more the regular cost of doing business in the market for 'knock off' products than an inequitable imposition to be avoided by courts considering the grant of injunctive relief."); *accord Blackberry*, 2014 WL 1318689, at *12 (granting preliminary injunction in patent case); *Robert Bosch*, 659 F.3d at 1156.

In contrast, Juicero faces the "substantial hardship [of] being forced to compete against its own patented invention." *Metalcraft of Mayville*, 848 F.3d at 1369 (internal quotation marks omitted) (affirming injunction). And "[w]here two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics*, 717 F.3d at 1345. This harm is even more acute, as here, where the market "is essentially a two-horse race." *Apple*, 809 F.3d at 646.

Defendants have also yet to begin delivering the infringing Juisirs to their customers, making it even less prejudicial for the Court to enter an injunction now rather than waiting until Defendants have established a greater foothold in the market. *See, e.g.*, *Trak, Inc. v. Benner Ski KG*, 475 F. Supp. 1076, 1078 (D. Mass. 1979) (enjoining defendant early on would "nip[] the operation in the bud" whereas denial of preliminary relief would result in defendant's entrenchment, "making permanent relief more problematical"); *Tuf-Tite, Inc. v. Fed. Package Networks, Inc.*, No. 14-CV-2060, 2014 WL 6613116, at *9 (N.D. Ill. Nov. 21, 2014) (finding balance of harm weighed against defendant that had "only recently entered the market").

The threat to Juicero's years of investment in creating a whole new product category far outweigh any harm Defendants may encounter in having to come up with a legitimate way to compete in the home juicing market.

## V.   THE PUBLIC INTEREST FAVORS AN INJUNCTION

An injunction will also undoubtedly serve the public's interest. The primary focus of this factor is "whether a ***critical*** public interest would be injured by the grant of injunctive relief." *Metalcraft of Mayville*, 848 F.3d at 1369 (emphasis added). Where no such interest is at risk, "the public is best served by enforcing patents that are likely valid and infringed." *Andrx Pharm.*, 452

F.3d at 1348.  Indeed, "[t]he public interest favors the enforcement of [the patentee's] patent rights" because "[s]uch investment in … research and development must be encouraged and protected by the exclusionary rights conveyed in valid patents."  *Celsis*, 664 F.3d at 931; *see also id.* ("That incentive would be adversely affected by taking market benefits away from the patentee and giving them to the accused infringer"); *Sandoz*, 544 F.3d at 1362 ("[B]y shifting market benefits to the infringer while litigation is pending for patents that are likely to withstand the [validity] attack, the incentive for discovery and development of new products is adversely affected"); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prod., LLC*, 676 F. Supp. 2d 752, 767 (E.D. Wis. 2009); *QBAS Co. v. C Walters Intercoastal Corp.*, No. SACV 10-406 AG MLGX, 2010 WL 7785955, at *15 (C.D. Cal. Dec. 16, 2010); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974) ("The patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development.").

So, while encouraging competition may be in the public's interest, "the public has a **greater interest** in acquiring new technology through the protections provided by the Patent Act than it has in buying 'cheaper knock-offs.'"  *Douglas Dynamics*, 717 F.3d at 1346 (emphasis added).  An injunction benefits the public most here because it will protect Juicero's investment in its invention and encourage new innovations by Juicero and others, and the public will still have access to a wide variety of non-infringing countertop juicers.  *Metalcraft of Mayville*, 848 F.3d at 1369 ("[I]n light of the importance of encouraging innovation and in light of the fact that the public can continue to obtain the patented suspension system from Scag or other non-infringing mowers from Toro, the public interest favors the issuance of an injunction.").

Because there is no critical public interest at risk of injury, and a strong interest in protecting Juicero's patent rights, the public is undoubtedly best served by an injunction.

## VI.   CONCLUSION

For the foregoing reasons, Juicero respectfully requests that the Court grant its motion for a preliminary injunction and enter the proposed order.

1

2     DATED:  May 19, 2017                    QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP
3

4                                            By  */s/ Kevin P.B. Johnson*
                                                 Kevin P. B. Johnson
5                                                Joseph Milowic III
                                                 Brett Arnold
6                                                Margaret Shyr
                                                 Attorneys for Juicero Inc.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28